Laurence M. Rosen (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BENJAMIN WEBER, derivatively on behalf of ENPHASE ENERGY, INC., <br><br> Plaintiff, <br><br> v. <br><br> BADRINARAYANAN KOTHANDARAMAN, ERIC BRANDERIZ, MANDY YANG, STEVEN J. GOMO, BENJAMIN KORTLANG, RICHARD MORA, and THURMAN J. RODGERS, <br><br> Defendants, <br><br> and <br><br> ENPHASE ENERGY, INC., <br><br> Nominal Defendant. | Case No.: <br><br><br><br><br><br> **DEMAND FOR JURY TRIAL** |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**INTRODUCTION**

Plaintiff Benjamin Weber ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Enphase Energy, Inc. ("Enphase" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Badrinarayanan Kothandaraman, Eric Branderiz, Mandy Yang, Steven J. Gomo, Benjamin Kortlang, Richard Mora, and Thurman J. Rodgers (collectively, the "Individual Defendants," and together with Enphase, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Enphase, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff's and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Enphase, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Enphase's directors and officers from February 26, 2019 through the present (the "Relevant Period").

2.      Enphase is a global energy technology company that delivers smart, easy-to-use solutions that manage solar generation, storage, and communication on one platform. The Company supplies solar microinverters and residential and commercial systems in over 130 countries. Enphase generates revenue from sales of its solutions, including its microinverter and related accessories, a communications gateway, and a cloud-based monitoring service to distributors, manufacturers, and strategic partners.

3.     On January 1, 2018, the Company began recognizing its revenue under Accounting Standards Codification No.606, *Revenue Recognition* known as "ASC 606." However, unbeknownst to the investing public, the Individual Defendants were causing the Company to improperly deploy ASC 606 to manipulate Enphase's financial results, overstate its revenues, and exaggerate its gross margin expansion rate. The Individual Defendants were able to improperly defer revenue and create a compelling image of fictional growth by hiring and maintaining a close-knit group of former colleagues in its operations based in the U.S. as well as its India-based office from two other solar power companies, in particular, Cypress Semiconductors ("Cypress") and SunEdison, Inc. ('SunEdison") to function as "yes-men" in order to perpetuate the accounting fraud. Among these hires, was Badrinarayanan Kothandaraman ("Kothandaraman"), who joined Enphase in April 2017 as the Company's Chief Operating Officer ("COO") and was promoted to Chief Executive Officer ("CEO") in September 2017. Defendant Kothandaraman previously worked at Cypress for approximately 21 years. Before Defendant Kothandaraman joined Enphase, the Company struggled to compete with its competition to grow sales and achieve profit. However, under Defendant Kothandaraman's leadership, Enphase's share price experienced unbelievable growth, from trading at $1.11 per share in September 2017 to trade at $52.76 per share as of June 12, 2020—a growth of 4,653%.

4.     Also during the 2018 fiscal year, amidst other improper accounting practices, the Company acquired a start-up company called ActivStor, which was co-founded by one of Enphase's own employees, who was also a former Cypress and SunEdison employee and had attended the same college as Defendant Kothandaraman. However, the related party transaction went wholly unaccounted for on the Company's financial statements (the "Undisclosed Related Party Transaction").

5.     Throughout the Relevant Period, the Individual Defendants touted the Company's growth, financial performance, and the prospects of its share price, while causing the Company to improperly defer revenue accounting and to grossly inflate its revenues and gross margins. The combined result presented a faulty image of enticing growth for the Company.

6.     The truth emerged on June 17, 2020, when analyst Prescience Point Capital Management ("Prescience"), who had previously questioned Enphase's accounting practices in 2018, published a

detailed report (the "Prescience Report") comprised of Prescience's investigations into the Company, including the findings of private investigators Prescience hired to conduct an on-the-ground examination of Enphase's India-based office and independent review of the Company's financial statements and purported results. The Prescience Report revealed "smoking gun evidence" and numerous red flags that indicated Enphase's reported growth and financial results were fictitious. The Prescience Report concluded that:

> the Company's financial statements filed with the SEC are fiction. Based on our research, we estimate that at least $205.3m of its reported US revenue in FY 2019 was fabricated. Based on statements provided by former employees and other solar industry participants, it appears that the Company inflated its international revenue significantly as well. We also believe that most, if not all, of the enormous 2,080 Bps expansion in the Company's gross margin during Kothandaraman's tenure as CEO—from 18.4% in Q2 2017 to 39.2% in Q1 2020—is fiction. We believe government bodies should investigate ENPH, Deloitte should launch an in-depth investigation of the Company's accounting practices, and the Board of Directors should establish an independent committee to examine the findings and analyses presented in this report.[1]

7.      The Prescience Report stated that data provided by to Prescience in connection with the investigation by 70% of Enphase's U.S.-based distributors revealed much lower growth than the Company's financial statements represented. The report also cited former employees of the Company, who maintained, *inter alia*, that the India-based Finance and Accounting team carried out directions from the Company's executives in the United States, the Company improperly applied ASC 606—among other improper accounting practices, and that Enphase's India office was saturated by a Cypress/SunEdison club-based culture purportedly run by "disgraced" former CEO of SunEdison, Ahmad Chatila. The Prescience Report further pointed out that just before Prescience's findings reached the public, Company insiders suspiciously dumped 24 million shares into the open market, for proceeds of $120.9 million in the span of 15 days—between June 1, 2020 and June 15, 2020.

8.      On this news, the Company's stock price plunged $13.72, or approximately 26%, from closing at $52.76 per share on June 16, 2020, to close at $39.04 per share on June 17, 2020.

---

[1]   https://www.presciencepoint.com/wp-content/uploads/2020/06/ENPH-June-2020-Report_FINAL.pdf. Last visited October 28, 2020.

9. During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or allowed certain of the Individual Defendants to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) Enphase utilized improper deferred revenue accounting practices, enacted and maintained by a close-knit group of former colleagues from Cypress and/or SunEdison; (2) these accounting practices included fabricating revenues and "tweaking" certain contracts; (3) as a result, the Company reported inflated revenues from its U.S. and international markets in its financial reports and overstated the base points expansion in its gross margins; (4) the Company also engaged in the Undisclosed Related Party Transaction; and (5) the Company failed to maintain internal controls.

10. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

11. The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

12. Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls and to engage in the Undisclosed Related Party Transaction.

13. Furthermore, each of the Individual Defendants engaged in insider sales during the Relevant Period while the stock was artificially inflated, netting proceeds of over $232.1 million collectively.

14. In light of the Individual Defendants' misconduct, which has subjected Enphase, its CEO, and its Chief Financial Officer ("CFO") to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of California (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due

to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

15.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the CEO's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Enphase's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n, Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

17.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

18.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

19.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation incorporated in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

20.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

21.     Venue is proper in this District because Enphase and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

22.     Plaintiff is a current shareholder of Enphase common stock. Plaintiff has continuously held Enphase common stock at all relevant times.

### Nominal Defendant Enphase

23.     Nominal Defendant Enphase is a Delaware corporation with its principal executive offices at 47281 Bayside Parkway, Fremont, California 94538. Enphase's shares trade on the Nasdaq Global Market ("NASDAQ") under the ticker symbol "ENPH."

### Defendant Kothandaraman

24.     Defendant Kothandaraman has served as the Company's President and CEO since September 2017 and as a Company director since May 2018. Defendant Kothandaraman joined the Company in April 2017 as COO. According to the Company's Schedule 14A filed with the SEC on April 10, 2020 (the "2020 Proxy Statement"), as of March 1, 2020, Defendant Kothandaraman beneficially owned 2,088,656 shares of the Company's common stock, which represented 1.7% of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's stock at the close of trading on February 28, 2020[2] was $48.97, Defendant Kothandaraman owned approximately $102.2 million worth of Enphase stock.

25.     For the fiscal year ended December 31, 2019, Defendant Kothandaraman received $3,886,852 in compensation from the Company. This included $450,000 in salary, $2,844,403 in stock awards, $588,719 in Non-Equity Incentive Plan compensation and $3,730 in all other compensation.

26.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Kothandaraman made the following sales of the Company's common stock:

---

[2] February 28, 2020 was the last trading day prior to March 1, 2020.

Verified Shareholder Derivative Complaint

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| September 9, 2019 | 10,000 | $24.75 | $247,500.00 |
| October 9, 2019 | 10,000 | $24.03 | $240,300.00 |

Thus, in total, before the fraud was exposed, he sold 20,000 Company shares on inside information, for which he received approximately $25.7 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

27.    The Company's 2020 Proxy Statement stated the following about Defendant Kothandaraman:

**Badrinarayanan Kothandaraman** joined Enphase in April 2017 as chief operating officer, before being appointed president and chief executive officer and a member of our board of directors effective September 3, 2017. Mr. Kothandaraman previously served as Executive Vice President of the Data Communications Division of Cypress Semiconductor, a semiconductor design and manufacturing company, from April 2011 to September 2016. An engineer by training, Kothandaraman received his bachelor of technology degree from IIT Madras and a master of science degree in materials science from University of California, Berkeley. He started his career with Cypress Semiconductor in 1995 and worked in process technology development and chip design before becoming vice president of the Asynchronous SRAM Business in 2008. Kothandaraman was subsequently promoted to executive vice president of Cypress's Data Communications Division in November 2011 and spent the next five years building the USB 3.0, USB-C and the Internet of Things businesses. He also served as the executive director of Cypress Semiconductor Technology India Private Limited from 2012 to 2016. Mr. Kothandaraman attended the Stanford Executive Program in 2008 and holds eight U.S. patents. Mr. Kothandaraman brings to our Board strong technical, operational, strategy, and leadership experience during his 21-year career at Cypress Semiconductor and his tenure at Enphase.

**Defendant Branderiz**

28.    Defendant Eric Branderiz ("Branderiz") has served as the Company's Executive Vice President and CFO since June 2018. According to the 2020 Proxy Statement, as of March 1, 2020, Defendant Branderiz beneficially owned 255,377 shares of the Company's common stock. Given that the price per share of the Company's stock at the close of trading on February 28, 2020 was $48.97, Defendant Branderiz owned approximately $12.5 million worth of Enphase stock.

29.     For the fiscal year ended December 31, 2019, Defendant Branderiz received $1,827,122 in compensation from the Company. This included $400,000 in salary, $962,530 in stock awards, $459,201 in Non-Equity Incentive Plan compensation, and $5,391 in all other compensation.

30.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Branderiz made the following sales of the Company's common stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| March 19, 2019 | 30,935 | $8.88 | $ 274,702.80 |
| September 9, 2019 | 10,000 | $24.74 | $ 247,400.00 |
| October 9, 2019 | 10,000 | $24.02 | $ 240,200.00 |
| June 3, 2020 | 100,249 | $54.96 | $5,509,685.04 |

Thus, in total, before the fraud was exposed, he sold 151,184 Company shares on inside information, for which he received approximately $6.2 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

31.     The Company's 2020 Proxy Statement stated the following about Defendant Branderiz:

***Eric Branderiz*** has served as our Vice President and Chief Financial Officer since June 2018. He previously served as Chief Accounting Officer and Corporate Controller of Tesla, Inc., an automotive and renewable energy company, from October 2016 to March 2018. Prior to Tesla, he held various positions at SunPower Corporation, a solar energy system design and manufacturing company, including: Senior Vice President, Corporate Controller and Chief Accounting Officer from August 2012 until October 2016, Vice President, Corporate Controller and Chief Accounting Officer from September 2011 to July 2012, Vice President and Corporate Controller from June 2010 to August 2011. Concurrent with his other responsibilities at SunPower, he was also Senior Vice President, Head of Corporate Tax from March 2016 until October 2016, and served as Senior Vice President, Head of Corporate Financial Planning & Analysis from June 2015 to March 2016 and as Senior Vice President, Global Residential and Light Commercial Operations and Finance from March 2013 to September 2014. From May 2009 through June 2010, he served as Vice President, Corporate Controller, Treasurer and Head of Subsidy Operations for Knowledge Universe. Mr. Branderiz was Senior Vice President and Corporate Controller and Head of Corporate Finance for Spansion, Inc. and its successor Cypress Semiconductor Corporation from September 2007 to April 2009. Prior to that Mr. Branderiz held various senior positions at Advanced Micro Devices, Inc. including Controller, Americas. Mr. Branderiz received a degree in Business Commerce, with a concentration in Accounting, from the University of Alberta, Canada in 1996, and

is a Certified Public Accountant. He began his career as an auditor at Ernst & Young LLP.

**Defendant Yang**

32.     Defendant Mandy Yang ("Yang") has served as the Company's Vice President, Chief Accounting Officer and Treasurer since October 2018.

33.     According to a current report filed on Form 8-K with the SEC on October 1, 2018, Defendant Yang receives an annual base salary of $265,000, is eligible for additional annual bonus opportunities of 35% of her base salary, and received a grant of 150,000 restricted stock units, a grant of 37,000 performance restricted stock units, and a hiring bonus of $15,000.

34.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Yang made the following sales of the Company's common stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| November 1, 2019 | 10,000 | $19.07 | $   190,700.00 |
| November 4, 2019 | 10,000 | $18.61 | $   186,100.00 |
| February 20, 2020 | 18,000 | $58.37 | $1,050,660.00 |
| June 3, 2020 | 36,570 | $55.06 | $2,013,544.20 |

Thus, in total, before the fraud was exposed, she sold 74,570 Company shares on inside information, for which she received approximately $3.4 million. Her insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates her motive in facilitating and participating in the scheme.

35.     The Company's website states the following about Defendant Yang:[3]

Mandy Yang

**Chief Accounting Officer and Corporate Treasurer**

Mandy brings to Enphase more than 20 years of accounting, financial reporting, treasury, and tax experience in the energy management, solar technology and semiconductor industries. Prior to joining Enphase in 2018, Mandy served as senior director and group controller at Tesla, Inc., where she was responsible for a global order to cash revenue financial accounting, APAC and EMEA regional controllership and accounting and financial shared services setup for APAC and EMEA. Mandy also held various positions

---

[3] https://enphase.com/en-us/leadership. Last visited October 28, 2020.

at SunPower Corporation, including senior director and division controller of the global distributed generation division, and concurrently as the chief accounting officer and corporate controller of 8point3 Energy Partners. Prior to that, she served in a variety of senior finance positions at Spansion Inc., including leading the firm's SEC financial reporting, corporate treasury and corporate financial planning and analysis functions. Earlier in her career, Mandy was an internal auditor at SYNNEX Corporation and an auditor with Deloitte and Touche. Mandy received her bachelor's degree in international business from National Taiwan University and her M.B.A. degree in finance and accounting from the University of Illinois at Urbana-Champaign. She is a Certified Public Accountant in California and a Chartered Financial Analyst.

**Defendant Gomo**

36.     Defendant Steven J. Gomo ("Gomo") has served as a Company director since March 2011. He also serves as Chair of the Audit Committee. According to the 2020 Proxy Statement, as of March 1, 2020, Defendant Gomo beneficially owned 308,413 shares of the Company's common stock. Given that the price per share of the Company's stock at the close of trading on February 28, 2020 was $48.97, Defendant Gomo owned approximately $15.1 million worth of Enphase stock.

37.     For the fiscal year ended December 31, 2019, Defendant Gomo received $183,000 in compensation from the Company. This included $88,000 in fees earned or cash paid and $95,000 in option awards.

38.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Gomo made the following sales of the Company's common stock:

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| February 26, 2020 | 67,781 | $57.92 | $3,925,876 |

His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

39.     The Company's 2020 Proxy Statement stated the following about Defendant Gomo:

**Steven J. Gomo** has served as a member of our Board since March 2011. From August 2002 until October 2004, Mr. Gomo served as Senior Vice President of Finance and Chief Financial Officer, and from October 2004 until December 2011, as Executive Vice President of Finance and Chief Financial Officer, of NetApp, Inc., a computer storage and data management company. From November 2000 to April 2002, Mr. Gomo served

as Chief Financial Officer of Gemplus International S.A., a smart card provider, and from February 1998 until August 2000, Mr. Gomo served as Chief Financial Officer of Silicon Graphics, Inc., a high-performance computer and computer graphics company. Prior to February 1998, Mr. Gomo held various finance, financial management, manufacturing, and general management positions at Hewlett-Packard Company, an information technology company. Mr. Gomo holds a bachelor of science degree in business administration from Oregon State University and a master of business administration degree from Santa Clara University. Mr. Gomo currently serves on the boards of directors of Nutanix, Inc., a next-generation hyperconverged enterprise cloud platform company; Micron Technology, Inc., a global memory and storage solutions provider; and Solaria Corporation, a privately-held solar panel company. From February 2005 to May 2017 Mr. Gomo served on the board of SanDisk Corporation, a designer, developer and manufacturer or flash storage solutions. From February 2012 to November 2017 Mr. Gomo served on the board of NetSuite Inc., a provider of cloud-based financials, enterprise resource planning and omnichannel commerce software suites. Mr. Gomo brings to our Board valuable financial and business expertise through his years of experience as a chief financial officer with publicly traded companies. Mr. Gomo provides an important role in leading the Board's activities on financial and auditing matters, as well as collaborating with our independent registered public accounting firm and management team in these areas.

**Defendant Kortlang**

40.     Defendant Benjamin Kortlang ("Kortlang") has served as a Company director since May 2010. He also serves Chair of the Nominating and Corporate Governance Committee and as a member of the Company's Audit Committee. According to the 2020 Proxy Statement, as of March 1, 2020, Defendant Kortlang beneficially owned 1,103,907 shares of the Company's common stock. Given that the price per share of the Company's stock at the close of trading on February 28, 2020 was $48.97, Defendant Kortlang owned approximately $54 million worth of Enphase stock.

41.     For the fiscal year ended December 31, 2019, Defendant Kortlang received $134,000 in compensation from the Company. This included $59,000 in fees earned or cash paid and $75,000 in option awards.

42.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Kortlang made the following sales of the Company's common stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| June 15, 2020 | 180,000 | 50.23 | 9,041,400 |

His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

43.     The Company's 2020 Proxy Statement stated the following about Defendant Kortlang:

**Benjamin Kortlang** has served as a member of our Board since May 2010. Since August 2016, Mr. Kortlang has been a Partner with G2VP, LLC, a venture capital firm. Since February 2008, Mr. Kortlang has been a Partner with Kleiner Perkins Caufield & Byers, a venture capital firm. From July 2000 to January 2008, Mr. Kortlang worked with Goldman, Sachs & Co., most recently co-heading Goldman's Alternative Energy Investing business. From June 2005 to February 2008, Mr. Kortlang was a Vice President within Goldman's Special Situations Group, before which he was a Vice President in Goldman's investment banking group focusing on Industrials and Natural Resources. From January 1996 to August 1998, Mr. Kortlang was an Associate with A.T. Kearney, Inc., a global management consulting firm where he focused on strategic and operations consulting in the energy, manufacturing, packaging, transportation and communications industries. From February 1993 to July 1994, Mr. Kortlang was a Business Analyst at National Australia Bank in strategic planning and macroeconomic forecasting. Mr. Kortlang holds a bachelor of business degree in economics and finance from Royal Melbourne Institute of Technology, a bachelor of commerce and an honors degree in econometrics from University of Melbourne and a master of business administration degree from the University of Michigan. Mr. Kortlang is currently a member of the board of directors of several privately-held companies. Mr. Kortlang's work as a venture capitalist with a focus on growth-stage investing in alternative energy technologies provides a valuable industry perspective to our Board. Additionally, Mr. Kortlang's investing and business experience also provide our Board with a valuable perspective on building alternative energy businesses.

**Defendant Mora**

44.     Defendant Richard Mora ("Mora") has served as a Company director since February 2014. He also serves as a member of the Audit Committee and Compensation Committee. According to the 2020 Proxy Statement, as of March 1, 2020, Defendant Mora beneficially owned 133,097 shares of the Company's common stock. Given that the price per share of the Company's stock at the close of trading on February 28, 2020 was $48.97, Defendant Mora owned approximately $6.5 million worth of Enphase stock.

45.     For the fiscal year ended December 31, 2019, Defendant Mora received $132,000 in compensation from the Company. This included $57,000 in fees earned or cash paid and $75,000 in option awards.

46.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Mora made the following sale of the Company's common stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| February 28, 2019 | 70,000 | $9.09 | $636,300.00 |
| August 14, 2019 | 60,000 | $31.03 | $1,861,800.00 |

Thus, in total, before the fraud was exposed, he sold 130,000 Company shares on inside information, for which he received approximately $2.4 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

47.     The Company's 2020 Proxy Statement stated the following about Defendant Mora:

**Richard Mora** has served as a member of our Board since February 2014. Since April 2017 through March 2020, Mr. Mora has served as the Chief Executive Officer of Landis+Gyr, an energy management company. From January 2014 to April 2017, Mr. Mora has served as the Chief Operating Officer of Landis+Gyr. From August 2011 to January 2014, Mr. Mora served as the President and Chief Executive Officer of Landis+Gyr Americas where he had responsibilities for operations in both North and South America. From August 2008 to August 2011 Mr. Mora served as the President and Chief Executive Officer of Landis+Gyr North America. Mr. Mora holds a bachelor of arts degree in economics from Stanford University. Mr. Mora's expertise in process and productivity improvements at the corporate, regional and country level provides a valuable perspective to our Board, as well as his years of experience with respect to emerging companies, risk management, team building and international operations.

**Defendant Rodgers**

48.     Defendant Thurman J. Rodgers ("Rodgers") has served as a Company director since January 2017. He also serves as a member of the Compensation Committee and Nominating and Corporate Governance Committee. According to the 2020 Proxy Statement, as of March 1, 2020, Defendant Rodgers beneficially owned 4,580,123 shares of the Company's common stock. Given that the price per share of the Company's stock at the close of trading on February 28, 2020 was $48.97, Defendant Rodgers owned approximately $224.2 million worth of Enphase stock.

49.     For the fiscal year ended December 31, 2019, Defendant Rodgers received $125,000 in compensation from the Company. This included $50,000 in fees earned or cash paid and $75,000 in option awards.

50.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Rodgers made the following sale of the Company's common stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| February 25, 2020 | 1,821,306 | $53.48 | $97,403,444.88 |
| February 26, 2020 | 178,694 | $51.68 | $9,234,905.92 |
| June 8, 2020 | 1,477 | $52.50 | $77,542.50 |
| June 10, 2020 | 1,668,721 | $50.22 | $83,803,168.62 |
| June 11, 2020 | 329,802 | $48.41 | $15,965,714.82 |

Thus, in total, before the fraud was exposed, he sold 4,000,000 Company shares on inside information, for which he received approximately $206.4 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

51.     The Company's 2020 Proxy Statement stated the following about Defendant Rodgers:

**Thurman John Rodgers** has served as a member of our Board since January 2017. Mr. Rodgers founded Cypress Semiconductor Corporation in 1982 and served as the President, Chief Executive Officer and as a member of the Board of Directors until April 2017. From May 2002 to May 2011 Mr. Rodgers served as a member of the board of directors of SunPower Corporation, an energy company. Mr. Rodgers is presently a member of the board of directors of several privately-held companies. From June 2004 through December 2012 Mr. Rodgers was a member of the board of trustees of Dartmouth College, his alma mater, and holds a bachelor of science degree in physics and chemistry from Dartmouth and a master's degree and Ph.D. in electrical engineering from Stanford University. At Stanford, Mr. Rodgers invented, developed and patented VMOS technology. Mr. Rodger's brings 35 years of public company CEO experience to our board.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

52.     By reason of their positions as officers, directors, and/or fiduciaries of Enphase and because of their ability to control the business and corporate affairs of Enphase, the Individual Defendants owed Enphase and its shareholders fiduciary obligations of trust, loyalty, good faith, and due

care, and were and are required to use their utmost ability to control and manage Enphase in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Enphase and its shareholders so as to benefit all shareholders equally.

53.     Each director and officer of the Company owes to Enphase and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

54.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Enphase, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

55.     To discharge their duties, the officers and directors of Enphase were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

56.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Enphase, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Enphase's Board at all relevant times.

57.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future

business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

58.     To discharge their duties, the officers and directors of Enphase were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Enphase were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Enphase's own Code of Conduct;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Enphase conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Enphase and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Enphase's operations would comply with all applicable laws and Enphase's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

     (f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

     (g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

     (h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

59.     Each of the Individual Defendants further owed to Enphase and the shareholders the duty of loyalty requiring that each favor Enphase's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

60.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Enphase and were at all times acting within the course and scope of such agency.

61.     Because of their advisory, executive, managerial, and directorial positions with Enphase, each of the Individual Defendants had access to adverse, non-public information about the Company.

62.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Enphase.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

63.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

64.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of Section 14(a) of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price.

65.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Enphase, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

66.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

67.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Enphase and was at all times acting within the course and scope of such agency.

## ENPHASE'S CODE OF CONDUCT

68.     Enphase's Code of Conduct "states the policy of [the Company] to conduct business with integrity and to follow ethical and legal business practices worldwide[]" and "applies to all employees,

directors, officers, contractors and consultants (collectively "Representatives") of Enphase and its subsidiaries, each of whom is responsible for their own personal conduct."

69.     In a section titled, "Compliance with Laws, Rules and Regulations." the Code of Conduct states the following:

> Representatives must respect and obey the laws of the cities, states and countries in which Enphase operates. Representatives should strive to understand the legal and regulatory requirements applicable to their business units and areas of responsibility, and should seek advice from managers or other appropriate individuals in case of any uncertainty. Violation of laws, rules and regulations may subject you, as well as Enphase, to civil and criminal penalties.

70.     The Code of Conduct provides that the Company's financial records "must be accurate" stating the following in relevant part in a section titled, "Accurate Financial Records":

> Our financial records must be accurate and complete in all material respects. They must be in compliance with laws and accounting practices. The Finance department is responsible for preparing and reporting Enphase's financial results, but those financial statements are the result of activities, transactions, entries and documents prepared throughout Enphase by many people. Representatives must make sure all such supporting transactions and documents are complete, accurate, and truthful.

> No Representative may take or authorize any action that would cause our financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules and regulations of the Securities and Exchange Commission ("SEC"), and other laws, rules and regulations, or take any action to fraudulently induce, coerce, manipulate or mislead the Finance department or our independent auditors. No Representative should knowingly allow Enphase to make any false or misleading statement or omit information necessary to make any of our statements and reports accurate.

> Any person who becomes aware of any departure from these standards has a responsibility to report their knowledge promptly to their manager, HR, Legal or via the Whistleblower Hotline.

71.     In a section titled, "Insider Trading" the Code of Conduct states that "[a]ll material non-public information about Enphase, our vendors, business partners and customers should be considered confidential, and Representatives who have access to such information should use it only for legitimate Enphase business. The use of any material nonpublic information to buy stock, or "tip" others, is unethical and illegal."

72. The Code of Conduct requires "Representatives" to "Avoid Conflicts of Interest" stating in relevant part that:

> A "conflict of interest" exists when a person's private interest interferes in any way with the interests of Enphase. Conflicts of interest may arise when a Representative, or a member of their family, receives improper personal benefits as a result of their position with Enphase. A conflict of interest can also arise when a Representative takes actions or has interests that make it difficult to perform their work objectively and effectively. Conflicts of interest are prohibited, unless specially approved by the Compliance Officer. If you have any questions about a potential conflict of interest or if you become aware of an actual or potential conflict of interest, you should discuss the matter with your manager, HR or Legal. Managers may not authorize conflicts of interest or make determinations as to whether a problematic conflict of interest exists without first seeking the approval of the Compliance Officer. If your manager is involved in the potential or actual conflict of interest, you should contact HR or Legal. Any conflict situation involving an executive officer or director, including all loans and guarantees by Enphase involving persons covered by this Code, also requires the authorization of the Audit Committee of the Board of Directors ("Audit Committee").

73. In a section titled, "Competition and Fair Dealing," the Code of Conduct states the following:

> We seek to outperform our competition fairly and honestly. We seek competitive advantages through superior performance and not through unethical or illegal business practices. Each Representative should endeavor to respect the rights of, and deal fairly with, our customers, suppliers, competitors and Representatives. No Representative should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other intentional unfair practice.

74. In a section titled, "International Business Laws," the Code of Conduct states the following, in relevant part:

> Our Representatives are expected to comply with the laws in all countries to which they operate, travel, or otherwise do business, including laws prohibiting bribery, corruption or the conduct of business with specified individuals, companies or countries. The fact that certain laws may not be strictly enforced will not be accepted as an excuse for noncompliance.

> As mentioned above, Anti-Bribery Laws prohibit giving anything of value in order to influence any improper action. Anti-Bribery Laws also require the maintenance of accurate books of account, with all transactions being properly recorded.

> U.S. embargoes restrict or, in some cases, prohibit Enphase from doing business with certain other countries, companies or individuals identified on lists that changes

periodically. If you are uncertain as to whether any given country, company or individual is currently on an embargo list, contact your manager or Legal before taking any action that could implicate such embargo.

Anti-boycott restrictions prohibit Enphase from taking any action that has the effect of furthering or supporting a restrictive trade practice or boycott that is fostered or imposed by a foreign country against a country or person friendly to the U.S. If a customer or vendor requests information about Enphase dealings with specific countries or requests that we agree not to do business with one or more countries, you must immediately contact your manager or Legal.

75.    In a section titled, "Protection and Proper Use of Enphase Assets," the Code of Conduct states that "[a]ll Representatives are expected to protect our assets and ensure their efficient use. Theft, carelessness and waste have a direct impact on our profitability."

76.    Moreover, the Code of Conduct provides that, "[i]f you become aware of any violations of this Code, you have a responsibility to report those violations, and should do so without fear of retaliation." The Code of Conduct further states in relevant part:

Managers must promptly bring reports of Code violations to the attention of the Compliance Officer. If you believe your manager has not taken appropriate action, you should contact the Compliance Officer directly.

Reports regarding accounting, internal accounting controls or auditing matters will be directed to the Audit Committee, which shall take responsibility for conducting or overseeing any investigation that is undertaken.

77.    The Individual Defendants violated the Code of Conduct by engaging in or permitting the scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of Section 14(a) of the Exchange Act, and failing to report the same. Moreover, all of the Individual Defendants violated the Code of Conduct by engaging in insider trading. Also in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, and compete in an honest and ethical manner.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

78.     Enphase is a global energy technology company that delivers smart, easy-to-use solutions that manage solar generation, storage, and communication on one platform. Enphase's primary products are solar microinverters, which convert direct current from panels to alternating current for houses and the grid. The Company also sells software and energy store solutions. The Company supplies solar microinverters and residential and commercial systems in over 130 countries. Enphase touts that it has "revolutionized the solar industry by bringing a systems approach to solar technology and by pioneering a semiconductor-based microinverter that converts energy at the individual solar module level and, combined with our proprietary networking and software technologies, provides advanced energy monitoring and control."

79.     Enphase generates revenue from sales of its solutions, including its microinverter and related accessories, a communications gateway, and a cloud-based monitoring service to distributors. Installers, manufacturers, and strategic partners.

80.     The Company describes its revenue recognition practices as follows:

On January 1, 2018, we adopted Accounting Standards Codification ("ASC") No. 606, "Revenue Recognition" ("ASC 606" or "Topic 606") and applied the modified retrospective method to all contracts that were not completed as of January 1, 2018. The most significant impacts upon adoption of Topic 606 were how we account for revenue related to our Envoy communications device and related Enlighten service and the timing of when certain sales incentives are recognized. The full consideration for these products represents a single performance obligation and is deferred and recognized over the estimated service period.

Revenues are recognized when control of the promised goods or services are transferred to our customers in an amount that reflects the consideration that is expected to be received in exchange for those goods or services. We generate all of our revenues from contracts with our customers.

\* \* \*

We record certain contra revenue promotions as variable consideration and recognizes these promotions at the time the related revenue is recorded.

We record upfront contract acquisition costs, such as sales commissions, to be capitalized and amortized over the estimated life of the asset. For contracts that have a duration of less than one year, we follow the Topic 606 practical expedient and expense these costs

when incurred. Commissions related to our sale of monitoring hardware and service are capitalized and amortized over the period of the associated revenue.

81.     Before 2017, the Company struggled to keep pace with competitors and generate profits. In April 2017, the Company hired Defendant Kothandaraman, initially as COO of the Company. Defendant Kothandaraman had previously served in various capacities at Cypress for about 21 years. A few months after he joined Enphase, Defendant Kothandaraman was promoted to CEO of the Company. Defendant Kothandaraman maintained that he would spearhead the Company towards growth and profit by implementing cost cutting initiatives that would enable Enphase to achieve 30% gross margins, reduce operating expenses to 20%, and reach 10% operating margins by the fourth quarter of the year end December 31, 2018. Enphase experienced astonishing growth in its gross margin by 43.7% in only the first three quarters of Defendant Kothandaraman's tenure. In response, the Company's stock price soared.

82.     However, although the Company continued to purportedly achieve exponential growth, especially with its reported revenues during the fiscal years 2018 and 2019, the Individual Defendants were executing an accounting fraud scheme to create a faulty image of growth and success at Enphase.

### *Improper Accounting Practices*

83.     Following its adoption of ASC 606 in January 2018, the Company began deferring portions of its revenue to fabricate and inflate its financial performance. For example. before its adoption of ASC 606, the Company deferred only the software portion of its revenue from its trademarked "Envoy" communications gateway, while hardware revenue was recognized at the time of sale. ASC 606 allowed the Company to defer both hardware and software portions of its revenue. The adoption of ASC 606 coincided with Defendant Kothandaraman's strategic growth plan, nearly tripled the size of Enphase's deferred revenue balances, and enabled the Individual Defendants to cause the Company to report grossly inflated revenues and gross margins. According to a former employee interviewed in connection with the Prescience Report, "the accounting doctors [at the Company] hide behind a newly introduced accounting standard in the US, effective Jan 2018, called ASC 606 that allows tinkering with deferred revenue accounting mechanism."

84.     Towards the end of the fiscal year ended December 31, 2018, the Company offshored its finance and accounting functions to India. Enphase's financial performance thereafter exploded in unprecedented ways over the following fiscal year ended December 31, 2019. Curiously, the Company's exponential growth occurred while its market share was declining, among other discrepancies. However, unbeknownst to the investing public, the Individual Defendants were causing the Company to improperly deploy ASC 606 to manipulate Enphase's financial results, overstate its revenues, and exaggerate its gross margin expansion rate. The Individual Defendants were able to improperly defer revenue and create a compelling image of fictional growth by hiring and maintaining a close-knit group of former colleagues in its operations based in the U.S. as well as its India-based office from Cypress and SunEdison to function as "yes-men" in order to perpetuate the accounting fraud.

85.     As outlined above, the Individual Defendants were able to maximize off misrepresentations of the Company's supposed success and prospects—before the investing public became aware that Enphase's growth was largely fictitious, netting proceeds of $232.1 million on insider sales during the Relevant Period.

### The Undisclosed Related Party Transaction

86.     According to the LinkedIn profile[4] of Jithender Majjiga ("Majjiga"), the Vice President of World Class Costs, Program Management at Enphase who joined the Company in June 2017, Majjiga co-founded a company called ActivStor—which was successfully sold to the Company in January 2018. Interestingly, according to his profile, Majjiga is also a former Cypress and SunEdison employee and had attended the same college as Defendant Kothandaraman, around the same time as Defendant Kothandaraman, upon information and belief. However, the Company failed to disclose that it had acquired the company in a related party transaction in its financial statements filed during the 2018 fiscal year. Moreover, the Company provided no account for its acquisition of ActivStor in its cash flow statements, in violation of Generally Accepted Accounting Principles ("GAAP"). In August 2018, the Company also acquired SunPower Corporation's ("SunPower") microinverter business and became the exclusive supplier for SunPower's AC Modules.

---

[4] https://www.linkedin.com/in/jithender-majjiga-a9a5/. Last visited October 28, 2020.

87.     According to Enphase's annual report filed with the SEC on February 21, 2020 for the fiscal year ended December 31, 2019 on a Form 10-K (the "2019 10-K"), the Company's reported cash used towards acquisitions during the fiscal year 2018 was $15 million—the entirety of which was spent for the Company's acquisition of SunPower's microinverter business.

88.     Thus, the Company failed to disclose and/or account for the Undisclosed Related Party Transaction.

**False and Misleading Statements**

*February 26, 2019 Form 8-K and Press Release*

89.     On February 26, 2019, Enphase issued a press release, filed as an exhibit to a current report filed on a Form 8-K with the SEC, announcing the Company's financial results for the fourth quarter ended December 31, 2018. The press release reported fourth quarter revenue of $92.3 million, "an increase of 18% sequentially and an increase of 16% year-over-year." The press release further announced non-GAAP gross margin of 30.7%, a decrease of 2.1 basis points from the third quarter results of 32.8%. The press release also reported $316.159 million in revenue for the year ended December 31, 2018 and gross margins of 29.9%, representing an increase from $286.166 million and 19.6% the year before, ended December 31, 2017.

*March 15, 2019 Form 10-K*

90.     On March 15, 2019, the Company filed its annual report with the SEC for the fiscal year ended December 31, 2018 on a Form 10-K (the "2018 10-K"), which was signed by Defendants Kothandaraman, Branderiz, Yang, Gomo, Kortlang, Mora, and Rodgers.  The 2018 10-K repeated net revenues of $316.159 million compared to $286.166 the prior year, an increase of approximately 10%, purportedly due "primarily to an increase in the average selling price per inverter combined with %5.3 million of revenue earned under a joint development agreement." The 2018 10-K also reiterated the increased gross margin percentages from 19.6% to 29.9%.

91.     The 2018 10-K stated the following about Enphase's accounting policies:

The most significant impacts upon adoption of Topic 606 were how the Company accounts for revenue related to its Envoy communications device and related Enlighten service and the timing of when certain sales incentives are recognized. Under ASC 605,

"Revenue Recognition," the Company's Envoy communications device and Enlighten service were considered two units of accounting, and the portion of the consideration related to the hardware was recognized at the time of sale with the remaining consideration deferred and recognized over the estimated service period. Under ASC 606 the full consideration for these products represents a single performance obligation and is deferred and recognized over the estimated service period. This treatment resulted in a gross increase to deferred revenue of $77.5 million, an increase in deferred costs of $43.4 million and a net increase in accumulated deficit of $34.1 million upon adoption of ASC 606.

92.     Attached to the 2018 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Kothandaraman and Branderiz, attesting to the accuracy of the 2018 10-K and maintaining specifically that the report and the financial statements therein did not contain any untrue statement of material fact or omissions and that the 2018 10-K fairly presented the Company's financial condition, results of operations and cash flows of Enphase in all material respects.

### April 2, 2019 Proxy Statement

93.     On April 2, 2019, the Company filed its Schedule 14A with the SEC (the "2019 Proxy Statement"). Defendants Kothandaraman, Gomo, Kortlang, Mora, and Rodgers solicited the 2019 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[5]

94.     With respect to the Company's Code of Conduct, the 2019 Proxy Statement stated, "[t]he Company has adopted the Enphase Energy Code of Business Conduct and Ethics ("Code of Conduct") that applies to all officers, directors and employees."

95.     The 2019 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, the insider trading engaged in by all of the Individual Defendants, and the Individual Defendants' failures to report violations of the Code of Conduct.

---

[5] Plaintiff's allegations with respect to the misleading statements in the 2019 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

96.     The Individual Defendants also caused the 2019 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, including equity awards "intended to drive creation of sustainable stockholder value" while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

97.     The 2019 Proxy Statement also failed to disclose, *inter alia*, that: (1) Enphase utilized improper deferred revenue accounting practices, enacted and maintained by a close-knit group of former colleagues from Cypress and/or SunEdison; (2) these accounting practices included fabricating revenues and "tweaking" certain contracts; (3) as a result, the Company reported inflated revenues from its U.S. and international markets in its financial reports and overstated base points expansion in its gross margins; (4) the Company also engaged in the Undisclosed Related Party Transaction; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### April 30, 2019 Press Release and Form 10-Q

98.     On April 30, 2019, the Company issued a press release, filed as an exhibit to a current report filed on Form 8-K with the SEC, announcing Enphase's financial results for the first quarter ended March 31, 2019. The press release reported revenue of $100.2 million, an increase of 43% year-over-year, cash flows from operating activities of $17.1 million, and GAAP gross margin of 33.3% and non-GAAP gross margins of 33.5%, "an increase of 280 basis points from 30.7% in the fourth quarter of 2018." The press release maintained that, "[t]he non-GAAP gross margin was negatively impacted by 280 basis points due to expedite fees related to component shortages." The press release further stated that the Company "continued to see strong demand across the board from our customers, overcoming the typical first quarter seasonality in the solar industry."

99.     The same day, on April 30, 2019, the Company filed its quarterly report with the SEC for the first quarterly period ended March 31, 2019 on a Form 10-Q (the "1Q19 10-Q"), which was signed by Defendant Branderiz. The 1Q19 10-Q reiterated the 43% increase in reported revenues of

approximately $100.2 million for the period, cash flows from operating activities, and gross margins reported in the accompanying press release.

100.    Attached to the 1Q19 10-Q were SOX certifications signed by Defendants Kothandaraman and Branderiz attesting to the accuracy of the 1Q19 10-Q, stating in relevant part, *inter alia*, that:

> [b]ased on [their] knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

> [b]ased on [their] knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report[.]

### July 30,2019 Press Release and Form 10-Q

101.    On July 30, 2019, the Company issued a press release, filed as an exhibit to a current report filed on Form 8-K with the SEC, announcing Enphase's financial results for the second quarter ended June 30, 2019. The press release reported revenue of $134.1 million, an increase of 77% year-over-year, cash flows from operating activities of $14.8 million, and GAAP gross margin of 33.8% and non-GAAP gross margins of 34.1%, "an increase of 60 basis points from 33.5% in the first quarter of 2019." The press release maintained that, "[t]he non-GAAP gross margin was negatively impacted by 330 basis points due to expedite fees related to component shortages[.]" Like the April 30, 2019 press release, the press release asserted that the Company "continued to see strong demand across the board from our customers[.]"

102.    The same day, on July 30, 2019, the Company filed its quarterly report with the SEC for the second quarterly period ended June 30, 2019 on a Form 10-Q (the "2Q19 10-Q"), which was signed by Defendant Branderiz. The 2Q19 10-Q reiterated the 77% increase in reported revenues of approximately $134.1 million for the period, reported $31.8 million in net cash flows from operating activities for the six months ended June 30, 2019, and reported the same gross margins as the accompanying press release.

103.   Attached to the 2Q19 10-Q were SOX certifications signed by Defendants Kothandaraman and Branderiz attesting to the accuracy of the 2Q19 10-Q, stating in relevant part, *inter alia*, that:

> [b]ased on [their] knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

> [b]ased on [their] knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report[.]

### October 29, 2019 Press Release and Form 10-Q

104.   On October 29, 2019, the Company issued a press release, filed as an exhibit to a current report filed on Form 8-K with the SEC, announcing Enphase's financial results for the third quarter ended September 30, 2019. The press release reported revenue of $180.1 million, an increase of 131% year-over-year, cash flows from operating activities of $5 million, and GAAP gross margin of 35.9% and non-GAAP gross margins of 36.2%, "an increase of 210 basis points from 34.1% in the second quarter of 2019." The press release maintained that, "[t]he non-GAAP gross margin was negatively impacted by 220 basis points due to expedite fees related to component shortages[.]"

105.   The same day, on October 29, 2019, the Company filed its quarterly report with the SEC for the third quarterly period ended September 30, 2019 on a Form 10-Q (the "3Q19 10-Q"), which was signed by Defendant Branderiz. The 3Q19 10-Q reiterated the 131% increase in reported revenues of approximately $180.1 million for the period, reported $36.8 million in net cash flows from operating activities for the nine months ended September 30, 2019, and reported the same gross margins as the accompanying press release.

106.   Attached to the 3Q19 10-Q were SOX certifications signed by Defendants Kothandaraman and Branderiz attesting to the accuracy of the 3Q19 10-Q, stating in relevant part, *inter alia*, that:

> [b]ased on [their] knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

[b]ased on [their] knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report[.]

***December 12, 2019 Analyst Presentation***

107.    On December 12, 2019, Enphase filed a current report on Form 8-K, attaching an analyst day presentation titled "Profitable Growth" as an exhibit thereto.  The presentation highlighted the Company's revenues of $619 million in revenue, an increase of 96% year-over-year, and its $122 million of operating income, a staggering increase of 495% year-over-year. The presentation further provided that Enphase had "[e]xceeded [its] financial target."

***February 18, 2020 Press Release***

108.    On February 18, 2020, Enphase issued a press release attached to a current report filed with the SEC on a Form 8-K. The press release announced Enphase's financial results for the fourth quarter and fiscal year ended December 31, 2019. The press release reported revenue of $210 million, cash flow from operations of $102.3 million, and GAAP gross margins of 37.1%. The press release further stated that "non-GAAP gross margin was 37.3%, an increase of 110 basis points from 36.2% in the third quarter of 2019."

109.    The press release also reported nearly double the reported revenue for the full year ended December 31, 2018, or $624.333 million for the full year ended December 31, 2019, compared to $316.2 million in 2018. The press release disclosed that GAAP gross margins also grew from 29.9% to 35.4%, that non-GAAP grew from 30.2% to 35.7%, and that Enphase's GAAP and non-GAAP earnings per share (i.e. "EPS"), significantly increased from a GAAP loss of $0.12 per share to a GAAP profit of $1.38 for basic EPS and $1.23 for diluted EPS, and from a non-GAAP profit of $0.10 per share to a non-GAAP profit of $1.06 for basic EPS and $0.95 for diluted EPS, all year-over-year.

***February 21, 2020 Form 10-K***

110.    On February 21, 2020, the Company filed the 2019 10-K, which was signed by Defendants Kothandaraman, Branderiz, Yang, Gomo, Kortlang, Mora, and Rodgers.  The 2019 10-K

repeated the financial results reported in the earlier-filed press release on February 18, 2020, for the fourth quarter and full year.

111.    The 2019 10-K made the following representations about Enphase's accounting policies:

We generate revenue from sales of our solutions, which include microinverter units and related accessories, an Envoy communications gateway, the cloud-based Enlighten monitoring service, and AC Battery storage solutions to distributors, large installers, OEMs and strategic partners.

On January 1, 2018, we adopted Accounting Standards Codification ("ASC") No. 606, "Revenue Recognition" ("ASC 606" or "Topic 606") and applied the modified retrospective method to all contracts that were not completed as of January 1, 2018. The most significant impacts upon adoption of Topic 606 were how we account for revenue related to our Envoy communications device and related Enlighten service and the timing of when certain sales incentives are recognized. The full consideration for these products represents a single performance obligation and is deferred and recognized over the estimated service period.

112.    Attached to the 2019 10-K were SOX certifications signed by Defendants Kothandaraman and Branderiz, attesting to the accuracy of the 2019 10-K and maintaining specifically that the report and the financial statements conveyed therein did not contain any untrue statement of material fact or omissions and that the 2019 10-K fairly presented the Company's financial condition, results of operations and cash flows of Enphase in all material respects.

### April 10, 2020 Proxy Statement

113.    On April 10, 2020, the Company filed the 2020 Proxy Statement. Defendants Kothandaraman, Gomo, Kortlang, Mora, and Rodgers solicited the 2020 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[6]

114.    With respect to the Company's Code of Conduct, the 2020 Proxy Statement stated, "[t]he Company has adopted the Enphase Energy Code of Business Conduct and Ethics ("Code of Conduct") that applies to all officers, directors and employees."

---

[6] Plaintiff's allegations with respect to the misleading statements in the 2020 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

115.    The 2020 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, the insider trading engaged in by all of the Individual Defendants, and the Individual Defendants' failures to report violations of the Code of Conduct.

116.    The Individual Defendants also caused the 2020 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, including equity awards "intended to drive creation of sustainable stockholder value" while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

117.    The 2020 Proxy Statement also failed to disclose, *inter alia*, that: (1) Enphase utilized improper deferred revenue accounting practices, enacted and maintained by a close-knit group of former colleagues from Cypress and/or SunEdison; (2) these accounting practices included fabricating revenues and "tweaking" certain contracts; (3) as a result, the Company reported inflated revenues from its U.S. and international markets in its financial reports and overstated base points expansion in its gross margins; (4) the Company also engaged in the Undisclosed Related Party Transaction; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### *May 5, 2020 Press Release and Form 10-Q*

118.    On May 5, 2020, the Company issued a press release, filed as an exhibit to a current report filed on Form 8-K with the SEC, announcing Enphase's financial results for the first quarter ended March 31, 2020. The press release reported revenue of $205.5 million, an increase of 105% year-over-year, cash flows from operating activities of $39.2 million, operating GAAP gross margins of 39.2% and non-GAAP gross margins of 39.5%. The press release maintained that, "non-GAAP gross margin increased to 39.5% from 37.3% in the fourth quarter of 2019, driven by disciplined pricing and cost management."

119.    The same day, on May 5, 2020, the Company filed its quarterly report with the SEC for the first quarterly period ended March 31, 2020 on a Form 10-Q (the "1Q20 10-Q"), which was signed

by Defendant Branderiz. The 1Q20 10-Q reiterated the 105% increase in reported revenues of approximately $205.5 million for the period, cash flows from operating activities, and gross margins as the accompanying press release.

120.    Attached to the 1Q20 10-Q were SOX certifications signed by Defendants Kothandaraman and Branderiz attesting to the accuracy of the 1Q20 10-Q, stating in relevant part, *inter alia*, that:

> [b]ased on [their] knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

> [b]ased on [their] knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report[.]

121.    The statements in ¶¶89-92, 98-112, and 118-20, were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) Enphase utilized improper deferred revenue accounting practices, enacted and maintained by a close-knit group of former colleagues from Cypress and/or SunEdison; (2) these accounting practices included fabricating revenues and "tweaking" certain contracts; (3) as a result, the Company reported inflated revenues from its U.S. and international markets in its financial reports and overstated base points expansion in its gross margins; (4) the Company also engaged in the Undisclosed Related Party Transaction; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

## The Truth Begins to Emerge

122.    On June 17, 2020, Prescience published the Prescience Report, contending that "[a]t least $205.3m of ENPH's reported FY19 US revenue is fabricated, and a significant portion of its international revenue is fabricated as well." The Prescience Report asserted that "[m]ost, if not all, of the 2,080 Bps expansion in ENPH's gross margin since Q2'17 is also fabricated." The Prescience Report maintained

that "[r]egulatory and law enforcement agencies with subpoena power should launch a full investigation of the Company, its accounting, its disclosures and trading by insiders."

123.    The Prescience Report disclosed that, following a red-flag tip from a former Enphase employee, Prescience launched another investigation into Enphase's accounting practices, after having warned that the Company's dramatic "overnight turnaround" financial results should not be trusted as early as July 2018. The Prescience Report specifically disclosed that:

> [a] breakthrough in our research of ENPH occurred in late 2019 when we were told by a former ENPH employee that the Company had, peculiarly, offshored many of its key financing and accounting ("F&A") functions to its India-based office in late 2018. As past accounting scandals have shown, offshore entities can and have been used as a tool to help companies perpetrate fraud. Given this, and our previous reservations about ENPH's accounting practices, we viewed this as a significant red flag that warranted further investigation.

124.    To conduct its investigation, the Prescience Report explained that Prescience "hired a reputable third-party private investigation firm to conduct on-the-ground research in India." The Prescience Report maintained that the investigation was "weeks-long" and involved the "private investigators [speaking] with numerous former ENPH employees and solar industry participants based in India. The findings of this investigation confirmed our suspicions and uncovered numerous troubling revelations about the Company's accounting and business practices."

125.    The Prescience Report revealed the Undisclosed Related Party Transaction, the "incestuous" connections between Company executives and directors and charted the puzzling disparities between Enphase's reported revenue and gross margin growth and the overall growth in the solar energy industry. The Prescience Report included independent evidence developed by Prescience, as well as data gleaned from interviews and its private investigators. The report scrutinized Enphase's financial reports to reveal numerous discrepancies and inexplicable results. For example, the Prescience Report pointed out, *inter alia*, that the Company's manufacturing or unit costs decreased a substantial amount, with no explanation, while a new U.S. imposed tariff on solar components imported from China was enacted was expectedly negatively impacting competitive solar energy companies, like SolarEdge.

126.    According to former employees interviewed and cited in the Prescience Report:

. . . ENPH's offshore F&A team in India is assisting in the Company's apparent book cooking: Former employees told our investigators that ENPH is using its offshore F&A team to help perpetrate its allegedly fraudulent accounting practices, under the direction of the US executive team. This has apparently helped the Company take its book cooking to new heights, as evidenced by the parabolic increase in its revenue since the India based F&A team was established at the end of FY 2018.

127.   The Prescience Report further provided, in relevant part that:

ENPH has stacked its executive teams in the US and India with 'Yes-Men' from Cypress and SunEdison, including with disgraced former SunEdison CEO Ahmad Chatila: According to former employees, Ahmad Chatila ("Chatila") is allegedly working for ENPH in some type of consultant or unofficial executive role, and apparently has a substantial amount of influence within the Company. In addition to Chatila, ENPH has stacked its executive teams in both the US and India with numerous other close, former colleagues from Cypress and SunEdison, seemingly for the purpose of creating an environment conducive to fraud. Former employees claim that these executives are very tightknit and secretive, and have, at times, reprimanded or even fired certain employees who questioned their accounting and business practices.

128.   According to the Prescience Report, the former employees interviewed, across the board, believed that, "ENPH's reported financials are likely fiction[]" stating in relevant part, "[a]lmost all of the former employees our private investigators spoke with either claimed or believed that the Company's financial performance was fabricated. Our investigators were also told that numerous current employees are similarly skeptical about ENPH's reported financials."

129.   Furthermore, according to the Prescience Report, the former employees confirmed that the Company was utilizing "improper deferred revenue accounting to inflate its financial performance[,]" providing in relevant part that:

Former employees indicated that a significant portion of the Company's astronomical growth over the past two years is attributable to improper deferred revenue accounting. Our investigators were also told that, as part of its deferred revenue accounting scheme, the Company may be "tweaking" some of its contracts, enabling it to recognize revenue prior to the actual service being provided.

130.   One former employee indicated that Enphase had "moved USD 77.5 m from liabilities, where the deferred revenues from the hardware should have been, to the earned revenue counter in 2018-19. They have done a similar sleight of hand in FY 2020…" and that "the improper recognition of this large amount of revenue was hidden or 'not publicly declared' in its financial reports." Another former employee explained in relevant part that:

. . .the company had already instituted a major accounting change via the ASC 606.Prior to adopting this practice, and before Badri was promoted to CEO, Enphase deferred only the software portion of its sales…However, after the adoption of AS 606, the company has been deferring both the hardware and software portion of its Envoy revenue since Jan 18…This is Badri's
magic contribution to the company's turnaround.

. . . But what Yang and Eric under Badri Kothandaraman are doing is overstating income by treating deferred revenue as earned revenue by recognizing revenue before it is actually earned.

131.    The Prescience Report further disclosed that the Company had been purportedly "buying" revenue from customers in order to enable the improper deferred revenue by "tweaking" contracts. A former employee cited in the Prescience Report maintained in relevant part that:

…(I think) that Enphase was buying turnover (revenue) using the services of shady CA (chartered accounting) firms…(The cost would be) clearly off set by the geometric gains that one makes in terms of valuation that this company has been achieving… The products are shipped at future dates as these resellers begin to get contracts from their installation partners. As long as you can show the advance orders you can continue to draw from the nectar of the deferred revenue.

It is like a pyramid scheme which cannot stop, and if it does, the entire accounting process will completely unravel. Expansion is therefore the key and that is why they have expanded to India and more relaxed territories like NZ and Australia and not to China where they might not be able to game their books.

It is kind of borrowing from the future to make the present look rosy…Now for a pyramid like scheme, which this accounting ingenious practice is all about, to continue the new money must continue to come in without interruption. That has stopped for a while now in India and their existing markets abroad, with the exception of the US. The company will need to find new markets quickly and this is the why they are moving so fast in the African markets.

132.    The Prescience Report also questioned whether the Company had been forging invoices to further inflate its financial performance. According to the report, an employee who worked for a Company distributor in India stated that, "his/her company severed its relationship with ENPH based on its belief that ENPH was circumventing them and working directly with installers to fraudulently inflate invoices."  The Presence Report further asserted that, "[w]e believe this suspected practice of forging invoices likely extends beyond what this one distributor experienced."

133.    The Prescience Report pointed out that the Company's India-based Bangalore office's alarmingly high rate of turnover (70%), is most probably a symptom of a toxic work culture and the Company's "apparent book cooking[.]"

134.    The Prescience Report further called attention to suspiciously timed and unprecedented insider trading, stating in relevant part:

> ENPH executives and board members, as well as its previous largest shareholder, appear to have learned of the existence of our private investigation and are desperately trying to unload their shares before the ship sinks. In the span of just four days from June 1st, 2020 to June 4th, 2020, ENPH executives sold an unprecedented 254,097 shares worth a whopping $13.7m in open market dispositions,17 which significantly exceeds the 187,508 or $3.9m worth of shares ENPH executives had sold in the almost 2.5 years prior. Additionally, board member TJ Rodgers sold an astonishing 2.0m shares worth $98.1m representing almost 60% of his total holdings, in open market dispositions in the span of just four days from June 8th, 2020 to June 11th, 2020. Furthermore, Ben Kortlang disposed of 180,000 ENPH shares worth $9.0m, representing a whopping 65% of his total holdings, in open market dispositions in the span of just one day on June 15th. Lastly, Chilean entrepreneur Isidoro Quiroga, who was ENPH's largest shareholder with an ~11% stake worth more than $800m, sold his entire investment in the span of just one day on May 20th, 2020.

135.    On this news, the Company's stock price plunged $13.72, or approximately 26%, from closing at $52.76 per share on June 16, 2020, to close at $39.04 per share on June 17, 2020.

## DAMAGES TO ENPHASE

136.    As a direct and proximate result of the Individual Defendants' conduct, Enphase has lost and expended, and will lose and expend, many millions of dollars.

137.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and its CEO and CFO, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

138.    Additionally, these expenditures include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

139.    As a direct and proximate result of the Individual Defendants' conduct, Enphase has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will

plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

140.     Plaintiff brings this action derivatively and for the benefit of Enphase to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Enphase, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

141.     Enphase is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

142.     Plaintiff is, and has continuously been at all relevant times, a shareholder of Enphase. Plaintiff will adequately and fairly represent the interests of Enphase in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

143.     Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

144.     A pre-suit demand on the Board of Enphase is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following seven individuals: Defendants Kothandaraman, Gomo, Kortlang, Mora, and Rodgers (the "Director-Defendants") along with non-parties Joseph Malchow and Jamie E. Haenggi (together, the "Directors"). Plaintiff needs only to allege demand futility as to four of the seven Directors that were on the Board at the time this action was commenced.

145.     Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while all of them engaged in insider sales based on material non-public

information, netting proceeds of over $222.4 million, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

146.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or allowing certain of the Individual Defendants to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

147.    Additional reasons that demand on Defendant Kothandaraman is futile follow. Defendant Kothandaraman has served as the Company's President and CEO since September 2017 and has served as a director of the Company since May 2018. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Kothandaraman with his principal occupation, and he receives handsome compensation, including $3,886,852 during the fiscal year ended December 31, 2019. Defendant Kothandaraman was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the foregoing press releases, and the 2019 and 2020 10-Ks and the aforementioned 10-Qs, which he signed and signed SOX certifications for. As the Company's highest officer and as a trusted long-time Company director, he conducted little, if any, oversight of the Company's engagement in the Undisclosed Related Party Transaction and scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. His insider sales before the fraud was exposed, which yielded at least $487,800 in proceeds, demonstrate his motive in facilitating and participating in the fraud. Moreover, Defendant Kothandaraman is a defendant in the Securities Class Action. For these reasons, too, Defendant Kothandaraman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

148.     Additional reasons that demand on Defendant Gomo is futile follow. Defendant Gomo has served as a Company director since March 2011. He also serves as Chair of the Audit Committee. Defendant Gomo has received and continues to receive compensation for his role as a director as described above. As a long-time trusted Company director, he conducted little, if any, oversight of the Company's engagement in the Undisclosed Related Party Transaction and scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Gomo signed, and thus personally made the false and misleading statements in, the 2019 10-K and 2020 10-K.  His insider sale before the fraud was exposed, which yielded at least $3.9 million in proceeds, demonstrates his motive in facilitating and participating in the fraud. For these reasons, too, Defendant Gomo breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

149.     Additional reasons that demand on Defendant Kortlang is futile follow. Defendant Kortlang has served as a Company director since May 2010. He also serves as Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee. Defendant Kortlang has received and continues to receive compensation for his role as a director as described above. As a long-time trusted Company director, he conducted little, if any, oversight of the Company's engagement in the Undisclosed Related Party Transaction and scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Kortlang signed, and thus personally made the false and misleading statements in, the 2019 10-K and 2020 10-K. His insider sale immediately before the fraud was exposed, which yielded at least $9 million in proceeds, demonstrates his motive in facilitating and participating in the fraud. For these reasons, too, Defendant Kortlang breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

150.     Additional reasons that demand on Defendant Mora is futile follow. Defendant Mora has served as a Company director since February 2014. He also serves as a member of the Audit Committee

and the Compensation Committee. Defendant Mora has received and continues to receive compensation for his role as a director as described above. As a long-time trusted Company director, he conducted little, if any, oversight of the Company's engagement in the Undisclosed Related Party Transaction and scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Mora signed, and thus personally made the false and misleading statements in, the 2019 10-K and 2020 10-K. His insider sales before the fraud was exposed, which yielded at least $2.4 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. For these reasons, too, Defendant Mora breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

151.    Additional reasons that demand on Defendant Rodgers is futile follow. Defendant Rodgers has served as a Company director since January 2017. He also serves as Chair of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Rodgers has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the Undisclosed Related Party Transaction and scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Rodgers signed, and thus personally made the false and misleading statements in, the 2019 10-K and 2020 10-K. His insider sales just before the fraud was exposed, which yielded over $206.4 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. For these reasons, too, Defendant Rodgers breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

152.    Additional reasons that demand on the Board is futile follow.

153.    As described above, all of the Director-Defendants on the Board directly engaged in insider trading, in violation of federal law. The Director-Defendants collectively received proceeds of

over $222.4 million as a result of insider transactions executed during the period when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein, with Defendant Rodgers in particular dumping over $206 million on the market shortly before the truth emerged. Therefore, demand in this case is futile as to them, and thus excused.

154.    The Director-Defendants have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For example, certain of the Director-Defendants have ties to Cypress, which, according to the Prescience Report, created an environment more conducive to fraud. They are also entwined with the Company, each other, and/or the other Individual Defendants through related party transactions and/or serving together as executives and directors at other companies. Defendant Kothandaraman served at Cypress for more than 21 years, including in various executive positions. Cypress was founded by Defendant Rodgers, who served as its president, CEO, and as a member of its board during Kothandaraman's tenure at Cypress. In addition, Rodgers served as a board member of SunPower from 2002 until 2011 and currently serves as a board member for Solaria Corporation, along with Defendant Gomo. Defendants Yang and Branderiz served as executives of SunPower, which was acquired by the Company in 2018, and were also both employed by Spansion, Inc., acquired by Cypress in 2015. In 2018, Defendant Rodgers also purchased $5 million aggregate principal amount of convertible senior notes due in 2023 in a private placement of convertible debt by the Company. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Director-Defendants would be futile.

155.    Defendants Gomo, Kortlang, and Mora (the "Audit Committee Defendants"), served on the Company's Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants were responsible for overseeing, *inter alia*, the Company's accounting and financial reporting processes, the integrity of the Company's financial statements and reports, the adequacy of the Company's disclosure controls and procedures, and the adequacy of the Company's internal controls over financial reporting. The Audit Committee Defendants

failed to ensure the integrity of the Company's financial statements and internal controls, as they are charged to do under the Audit Committee Charter, allowing the Company to file false and misleading financial statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

156.     In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and waste of corporate assets. Moreover, in violation of the Code of Conduct, the Director-Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, or conduct business in an honest and ethical manner. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

157.     Enphase has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Enphase any part of the damages Enphase suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

158.     The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

159.     The acts complained of herein constitute violations of fiduciary duties owed by Enphase's officers and directors, and these acts are incapable of ratification.

160.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Enphase. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Enphase, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

161.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Enphase to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

162.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

### **Against Individual Defendants for Violations of Section 14(a) of the Securities Exchange Act of 1934**

163.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

164.    The claims made pursuant to Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), that are alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

165.    Section 14(a) of the Exchange Act provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

166.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

167.    Under the direction and watch of the Directors, the 2019 and 2020 Proxy Statements (the "Proxy Statements") failed to disclose, *inter alia*, that: (1) Enphase utilized improper deferred revenue accounting practices, enacted and maintained by a close-knit group of former colleagues from Cypress and/or SunEdison; (2) these accounting practices included fabricating revenues and "tweaking" certain contracts; (3) as a result, the Company reported inflated revenues from its U.S. and international markets in its financial reports and overstated base points expansion in its gross margins; (4) the Company also engaged in the Undisclosed Related Party Transaction; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

168.    The Individual Defendants also caused the Proxy Statements to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements including equity awards "intended to drive creation of sustainable stockholder value" while failing to disclose that the Company's share price was being artificially inflated by the false and misleading statements made by the Individual Defendants as alleged herein, and therefore any compensation based on the Company's financial performance was artificially inflated.

169.    Moreover, the Proxy Statements were false and misleading when they discussed the Company's adherence to specific governance policies and procedures, including the Code of Conduct, due to the Individual Defendants' failures to abide by them, their insider trading, and their engagement in the scheme to issue false and misleading statements and omissions of material fact.

170.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statements, including election of directors, appointment of an independent auditor.

171.    The false and misleading elements of the Proxy Statements led to the re-election of Defendants Kothandaraman, Gomo, Kortlang, Mora, and Rodgers during the Relevant Period, which allowed them to continue breaching their fiduciary duties to Enphase.

172.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements, and/or approval of an amendment to the Company's Certificate of Incorporation to increase the number of authorized shares of common stock to 200 million shares and a stockholder proposal requesting the Company to issue a sustainability report describing its environmental, social and governance performance.

173.    Plaintiff on behalf of Enphase has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

174.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

175.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Enphase's business and affairs.

176.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

177.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Enphase.

178.   In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

179.   In further breach of their fiduciary duties owed to Enphase, the Individual Defendants willfully or recklessly made and/or allowed the Company to engage in the Undisclosed Related Party Transaction and made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) Enphase utilized improper deferred revenue accounting practices, enacted and maintained by a close-knit group of former colleagues from Cypress and/or SunEdison; (2) these accounting practices included fabricating revenues and "tweaking" certain contracts; (3) as a result, the Company reported inflated revenues from its U.S. and international markets in its financial reports and overstated base points expansion in its gross margins; (4) the Company also engaged in the Undisclosed Related Party Transaction; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

180.   The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

181.   In breach of their fiduciary duties, five of the Individual Defendants engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.

182.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of

material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

183. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

184. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

185. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Enphase has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

186. Plaintiff on behalf of Enphase has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

187. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

188. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Enphase.

189.    The Individual Defendants either benefitted financially from the improper conduct tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Enphase that was tied to the performance or artificially inflated valuation of Enphase, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

190.    Plaintiff, as a shareholder and a representative of Enphase, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

191.    Plaintiff on behalf of Enphase has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Abuse of Control

192.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

193.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Enphase, for which they are legally responsible.

194.    As a direct and proximate result of the Individual Defendants' abuse of control, Enphase has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Enphase has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

195.    Plaintiff on behalf of Enphase has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Gross Mismanagement

196.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

197. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Enphase in a manner consistent with the operations of a publicly-held corporation.

198. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Enphase has sustained and will continue to sustain significant damages.

199. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

200. Plaintiff on behalf of Enphase has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

201. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

202. The Individual Defendants caused the Company to pay themselves excessive salaries, bonuses, fees, and/or stock grants, to the detriment of the shareholders and the Company.

203. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused Enphase to waste valuable corporate assets, to incur many millions of dollars of legal liability and costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

204. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

205. Plaintiff on behalf of Enphase has no adequate remedy at law.

## PRAYER FOR RELIEF

206. FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Enphase, and that

Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Enphase;

(c)     Determining and awarding to Enphase the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Enphase and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Enphase and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Enphase to nominate at least three candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Enphase restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

Verified Shareholder Derivative Complaint

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.


Dated: October 28, 2020                    Respectfully submitted,

                                           **THE ROSEN LAW FIRM, P.A.**

                                           By: /s/ Laurence M. Rosen
                                           Laurence M. Rosen (SBN 219683)
                                           355 S. Grand Avenue, Suite 2450
                                           Los Angeles, CA 90071
                                           Telephone: (213) 785-2610
                                           Facsimile: (213) 226-4684
                                           Email: lrosen@rosenlegal.com

                                           *Counsel for Plaintiff*

Verified Shareholder Derivative Complaint

## **VERIFICATION**

I, Benjamin Weber am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of _____, 2020.

10/28/2020

Benjamin Weber